RECEIVED

MAY 0 6 2026

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

**UNITED STATE DISTRICT COURT**

**DISTRICT OF MINNESOTA**

26-cv-2524-PJS/EMB

## PARTIES

(Plaintiff vs. All Defendants in their personal and professional capacity)

**Plaintiff:**

**Jane Doe**

**Defendants:**

1- Metropolitan State University;
2- Amy Gort, in her individual and official capacities;
3- Ginny Arthur, in her individual and official capacities;
4- Rassule Hadidi, in his individual and official capacities;
5- Josefina Landreau, in her individual and official capacities;
6- Minjung Park, in her individual and official capacities;
7- Kristin Burgess, in her individual and official capacities;
8- Maya Sullivan, in her individual and official capacities;

**Address of all Defendants:**

700 7th St E, St Paul, MN 55106

Phone: (651) 793-1300

---

## FACTUAL ALLEGATION

## 1.Teaching Excellence and Positive Performance Evidence

1. Plaintiff is a multi-award winning professor who earned several awards for being "outstanding professor," "inspirational professor," from multiple top universities. Plaintiff maintained high performance and unprecedent participation to MSU.

2. Throughout her employment at Metropolitan State University (MSU), Plaintiff demonstrated excellence, dedication, and substantial teaching, research, service, professional development, and significant contribution to students' success.



SCANNED
MAY 0 6 2026
U.S. DISTRICT COURT ST. PAUL

1

3. Plaintiff's performance excellence is further supported by numerous testimonials from faculty, staff, and students, as reflected in Exhibits 1.1 through Exhibit 1.6, Exhibit 2.1 and Exhibit 2.2.

4. **Excellence in Teaching Awards in Spring 2023:** Plaintiff was nominated at MSU for the Board of Trustees Excellence in Teaching Award in Spring 2023.

5. **Excellence in Service/Community Engagement Awards in 2024:** Upon information and belief, Plaintiff was also nominated for additional award(s) in Spring 2024, around the time Defendant Gort prepared for Plaintiff's termination. The University did not inform Plaintiff this nomination; Plaintiff learned of it from insiders.

6. Defendants Gort, Hadidi, and Arthur are Aware of Plaintiff's Excellence: Defendants

7. Defendants are aware of Plaintiff's extensive volunteer service to the department, school, and university, including program development, student success and recruitment.

8. They are aware of Plaintiff's unprecedented participation and volunteering activities in committees, councils, student conferences, and other institutional activities.

9. **Plaintiff Active Participation in Councils Alongside Defendant Gort:** Plaintiff also served on the Academic Quality and Innovation Council alongside Defendant Provost Gort in Fall 2023 and Spring 2024. Through this role, Defendant Gort had direct knowledge of Plaintiff's high-level engagement, consistent meaningful participation, and strong contributions to University governance and academic initiatives.

## 2. Institutional Instability and Administrative Mismanagement

10. During Plaintiff's employment, Metropolitan State University experienced significant administrative instability.

11. The entire HR department resigned in 2021–2022. Defendant Arthur assumed HR responsibilities.

12. Between 2021 and 2024, the University cycled through approximately three to four Vice Presidents of Human Resources and three to four Vice Presidents of Finance, in addition to multiple interim appointments.

## 3. Discriminatory Pay and Rank

13. Defendant Gort has hiring, rank and salary assigning authority.

14. Plaintiff holds a doctorate degree (PhD) in the field of specialization. Plaintiff started working at MSU in August 2021.

15. At all times relevant, Plaintiff's compensation and rank were governed by the IFO Collective Bargaining Agreement.

16. On March 26, 2021, during the hiring process, Defendant MSU confirmed via email that "the University's official salary calculator had credited [Plaintiff] with 20 years of experience." See Exhibit 3

17. With this official credit of 20 years in 2021, a rank of "Full Professor" under the IFO Collective Bargaining Agreement (Article 21 Section D) should be assigned to Plaintiff.

> **Article 21 Section D. IFO Contract reads** [Initial Assignment to Rank:
>
> Qualifications for initial assignment to faculty rank are to be as follows: Professor:

3

Earned doctorate or other appropriate degree, plus 10 years of collegiate-level teaching or related experience.]

18. Defendant Gort assigned Plaintiff the rank of "Assistant Professor"—a rank typically reserved for those with zero to seven years of experience.

19. When Plaintiff raised salary and rank concerns in March 2021, Defendant Gort confirmed to Plaintiff that the compensation and rank were correct and strictly consistent with university policies and the IFO Collective Bargaining Agreement.

20. Plaintiff relied on Defendant Gort's representations to her detriment when Plaintiff accepted the position.

21. Defendant MSU and its agent Defendant Gort failure to apply the IFO contract's objective criteria to the Plaintiff resulted in significant lost wages, unpaid overtime, and diminished benefits, constituting both wage theft and unlawful discrimination.

22. Defendant MSU and Defendant Gort provided significantly higher compensation and higher academic rank to similarly situated faculty members outside the Plaintiff's protected classes who have much less years of experience or less qualifications. For instance, Jin Sung (Asian Male, outside Plaintiff protected class) received about twice the Plaintiff's total compensation despite he has less years of experience. **See Exhibit 4 and 5 for more comparators.**

23. **Defendant Gort Replaced Plaintiff with Less Experienced or Less Qualified Male Faculty of Different Ethnicity:** Following Plaintiff's termination, Defendants replaced her with male faculty members such as Chukwuneke Okorie who possessed

significantly less qualifications and experience (public teaching rate 1/5), yet Defendant Gort assigned him a higher academic rank than Plaintiff.

24. Defendant Gort also allowed Chukwuneke Okorie to take over all the work Plaintiff started and developed with Mayo Clinic for over three years without giving Plaintiff any credit.

25. Defendants Gort and Arthur confiscated all her intellectual work as previously indicted in previous paragraphs in the intellectual property misappropriation section.

**Minnesota State Government Payroll Data**

26. **Minnesota State Government Payroll Data:** Minnesota State Government payroll data demonstrate disparities in salary, rank, benefits, promotion, tenure, and overtime compensation.

27. The data showed that Plaintiff was compensated at a much lower level than similarly situated faculty with much less experience and qualifications. See Exhibits 4 and Exhibit 5 for salary, rank, and benefits comparators.

28. Minnesota State Government payroll data also demonstrate that Plaintiff did not receive earned wages and overtime compensation.

29. Minnesota State Government Payroll Data further contradicts Defendant Gort's representations; similarly situated faculty members outside Plaintiff's protected classes were assigned higher ranks and salaries for lesser experience. See Table 1 and Table 2

5

Table 1. Comparator (Asian)- Salary, Benefits, Promotion, and Rank Discrimination and Retaliation

| Faces of Comparisons | Comparator: Minjung Park | Plaintiff |
|---|---|---|
| Same Department, College, Bargaining Unit, Supervisor | Yes | Yes |
| Years of experience in 2021 | Less than 10 | More than 20 |
| Total Compensation ($) in 2022 | $118,316 | $85,6576 |
| Earned PhD in Business/Management | No | Yes |
| Number of single or first author-peer reviewed journal publication since joining MSU | Zero | 3 |
| Number of single or first author peer reviewed journal publication as of 2025 | Zero | 10+ |
| Experience serving in AACSB accredited business school as a resident faculty | No | Yes |
| Number of teaching awards earned/nominated from AACSB accredited schools | Zero | 4 |
| Number of research awards nominated/applied for | Zero | 2 |
| Number of MSU students taught before applying for Tenure & Promotion | About one third of Plaintiff | Much higher (three times) |
| Number of students provided teaching feedback | Very Low | More than four times |
| Date of Hire at Metro State University, MN | August 2020 | August 2021 |
| Date Applied for Tenured and Promotion (T&P) | Jan. 2023 | Jan. 2024 Application discouraged and denied |
| Duration of actual duty (teaching) before applying for T& P | Less than 29 months (About 26 months) | 29 full months |
| Higher number of committees they served on before applying for T & P | No | Yes, much higher |
| Higher number of professional self/community development growth activities | No | Yes, much higher |

6

| Over stated her achievements | Yes | No |
|---|---|---|
| **Metro State University (MSU) Discriminatory Salary, Rank, and Tenure Decisions** | | |
| **MSU granted Tenure and Promotion** | Yes | Denied |
| **Higher Rank** | Yes | Denied. Despite being much more qualified and experienced |
| **Total Compensation ($)** | Significantly higher | Much less |
| **MSU Paid Financial Professional Development Support** | Yes | Denied |
| **Leadership Positions Granted** | Yes, despite being **unqualified** | Denied. Despite being qualified and experienced |
| **Allowed to be the chair of the department** | Yes, despite being **unqualified** | No, Despite being qualified and experienced |
| **4030 Grant to Develop Analytic Class** | Granted ($7000) | Denied |
| **Allowed to serve as the chair of the DSCI faculty hiring search in 2023-2024** | Yes, despite being unqualified and not experienced | Denied, despite being highly qualified and experienced |
| **Allowed to teach more classes in the summer to make bonuses** | Yes, many classes. Tens of thousands of dollars in extra pay | Denied. Classes reassigned to others for retaliatory purposes. **See Exhibits 6 through 9** |
| **Summer teaching for extra pay in 2023** | 3 classes | One class at a maximum after months of argument and humiliation |
| **Allowed to go up early for tenure and promotion** | Yes | Denied |
| **Disability** | No | Yes |
| **Opposed discrimination and retaliation and other protected activities** | No | Yes |
| **Protected age group** | No | Yes |
| **Race/Ethnicity/Color/National Origin** | Asian | Not Asian- Not Korean- Not Chinese-Not Indian |

7

**Table 2. More Comparators Unequal Pay and Pay Discrimination. Data Obtained from Minnesota Government Payroll Data**

| Table 2. Unequal Pay and Pay Discrimination. Data Obtained from Minnesota Government Payroll Data | | | |
|---|---|---|---|
| | 2022 | 2024 | |
| **Name, Color, protected class** | **Total Compensation High to Low ($)** | **Total Compensation High to Low ($)** | **Years of Experience** |
| **Comparator 1:** Booker, Queen E (Black, Female. different ethnicity and national origin, not engaged in protected activity) | 187,802.96 | 229,967.54 | More than 22 years of experience |
| **Comparator 2:** Jin, Sung (Asian, Male, different ethnicity and national origin, not engaged in protected activity) | 152,685.37 | 163,876.31 | Less than 12 |
| **Comparator 3:** Park, Minjung (Asian, Female, different age group, different ethnicity, not engaged in protected activity) | 107,284.08 | 138,187.88 | Less than 10 |
| **Plaintiff: (Perceived Middle Eastern, Female, different ethnicity and different national origin from comparators, engaged in protected activities)** | **85,657.36** | **118,316** | More than 22 years of experience |

## Rank and Salary Disparity

30. **Side-by-Side Comparison:** Table 1 provides a side-by-side comparison between Plaintiff and comparator faculty member Defendant Minjung Park (Asian). Same bargaining unit. The comparison shows that Defendant Gort assigned higher compensation, promotion to higher rank, tenure, leadership position despite having substantially less years of collegiate-level teaching experience than Plaintiff.

8

31. Defendant Park does not have a doctorate degree in management and has no prior experience or qualification for such leadership position they assigned to Park.

32. Defendant Park is outside Plaintiff's protected classes and has not engaged in the protected activities that Plaintiff reported.

**More Comparators-Rank and Salary Discrimination**

33. Chukwuneke Okorie (Male), Loi Nguyen, Simon Jin Sung (Male), Sonai Chaudhuri, etc. (all are from different ethnicity, national origin, color, never involved in protected activities). All were assigned higher rank, salary, tenure, promotion despite some of them might be having about half of the Plaintiff's collegiate level experience.

34. Plaintiff was the only faculty who held full time faculty positions and earned or nominated for awards serving in top universities including Washington University in St. Louis, the University of Illinois at Urbana Champaign, Toledo University, as well as Defendant MSU.

**Ongoing Discriminatory Denial of Compensation-Bearing Opportunities and Administrative Roles**

35. Plaintiff was denied equal access to income-generating assignments available to similarly situated faculty (Becky Evans and Minjung Park) who even have less experience and qualifications.

36. Administrative roles, summer teaching, grants, and other assignments at Metropolitan State University regularly provide additional compensation through stipends, overtime, or summer salary. See Exhibits 6 through 9.

9

37. Despite being qualified for such opportunities, Plaintiff was repeatedly excluded from them while other faculty outside Plaintiff's protected status were granted those assignments.

38. Plaintiff was denied serving as department chair or as a chair of hiring search committees despite being qualified.

39. Such roles were assigned to Defendant Minjung Park who from outside the protected class of the Plaintiff. Park is far less qualified than the Plaintiff.

40. Defendant Park was also granted tenure, promotion and associated raises while Plaintiff was even discouraged from applying and later was denied.

**Refusal to Cure Salary Disparity and Disappearing Paystub Dates**

41. In November 2023, Plaintiff raised salary concern to the union regarding how her compensation is lower than her peers and lower than what it should be based on IFO contract. The union answer revealed a use of "secret algorithm" that the university prohibit faculty from learning about.

42. On April 6, 2024, Plaintiff sent a formal written inquiry to Defendants Gort and Arthur regarding the persistent miscalculation of her rank and salary and referenced the 2021 hiring promise. **Email to HR, Defendant Gort and Defendant Arthur documenting miscalculation and misrepresentation of Plaintiff's credentials** is presented in Exhibit 10.

43. This email constituted a Protected Activity under the Minnesota Human Rights Act and Title VII, as it challenged unequal compensation based on a contractual formula that Defendants were applying disparately.

10

44. Defendants Gort and Arthur ignored Plaintiff's emails and did not initiate the mandatory "Salary Calculator" adjustment.

45. Defendant Arthur terminated Plaintiff's employment after few days.

**Dates on Paystubs Are Removed**

46. Plaintiff found later that the start and end dates over which Plaintiff's pay is made were removed by defendant MSU from Plaintiff's paystubs.

47. Plaintiff last paystub was issued for 13 dollars was issued in May 2024.

**Unequal and Discriminatory Pay**

48. In Defendant EEOC position statement, Defendant MSU and its agent Defendant Gort attempted to justify the disparity between Plaintiff's 20 years of credited experience and her under assigned "Assistant Professor" rank by asserting that the Plaintiff "could have turned down the offer."

49. Plaintiff relied on the communication from the hiring body Defendant Gort that that Plaintiff's salary and rank were accurately estimated.

50. Plaintiff later found that Defendant Gort communication to be incorrect, contradicts the IFO contract, and is inconsistent with salaries and ranks assigned to others outside Plaintiff protected class.

51. The **"Plaintiff could have turned down the offer"** statement made by Defendant Gort constitutes a formal admission that the Defendant did not believe it was bound by the mandatory, objective salary and rank formulas set forth in the IFO Collective Bargaining Agreement (CBA) when dealing with the Plaintiff. IFO mandates specific pay for specific experience.

11

52. **"Plaintiff could have turned down the offer"** statement serves as admission that Defendant's internal "Salary Calculator" (referenced in the March 26, 2021, email Exhibit 3) was intentionally bypassed to suppress the Plaintiff's wages.

53. Further, the said statement **"could have turned down the offer,"** coupled with the objective data obtained from Minnesota Government Payroll Data presented in Table 2, demonstrate that Plaintiff's compensation was substantially lower than similarly situated faculty members (same school and same bargaining unit) who even have less experience.

54. The disparity supports an inference that Defendant's compensation decision was motivated by discriminatory considerations, including Plaintiff's sex, race, color, national origin, age, ethnicity, and her engagement in protected activities, in violation of federal anti-discrimination laws including Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967.

### Unpaid Summer Over Time and Removal of Summer Assignment Following Protected Reporting

55. Under Article 13, Section C of the IFO contract, faculty members receive 9% of their academic-year salary for each four-credit summer course taught.

56. Defendant MSU deviated from this mandatory formula when compensating the Plaintiff for summer instruction.

57. Even using the reduced and improperly assigned base salary, the contractual formula would have required payment of **approximately $10,000 for a four-credit summer course**. However, according to official Minnesota state payroll records, MSU

12

paid Plaintiff only **$3,000 for the course in 2022**, an amount dramatically below the compensation required under the governing collective bargaining agreement.

58. It is worth noting that Plaintiff was assigned 3 summer classes. Two of them were removed two days after she reported on EEO violation, and her payment for the one class left was also reduced to $3000.

59. Had Plaintiff been assigned the correct salary and rank consistent with the IFO contractual formula, she would have earned approximately **$18,000 per the four-credit undergraduate summer course per year**. Under the CBA, Plaintiff was eligible to teach up to **four summer courses (16 credits)**, which would have resulted in total summer compensation exceeding **$72,000 per year**.

60. Deviation from the contractually mandated compensation structure provides additional evidence that Plaintiff's wages (regular and over time) were systematically underestimated, constituting:

(1) the withholding of wages owed under the governing collective bargaining agreement;

(2) discriminatory compensation practices prohibited under federal law, including Title VII of the Civil Rights Act of 1964 and the Equal Pay Act of 1963;

(3) a breach of the IFO Collective Bargaining Agreement.

61. This discrepancy demonstrates that MSU failed to apply the contractual compensation formula even after assigning Plaintiff an artificially reduced salary. The resulting underpayment provides additional evidence of wage suppression and unequal compensation relative to similarly situated faculty members of outside Plaintiff's

13

protected classes who did not report on protected activities. Plaintiff raised these issues to Defendants and they never took corrective actions.

## 4. Fraudulent Inducement Tenure, Promotion, Raise Discrimination

62. In March 2021, during the hiring negotiation, Defendant Gort, who has hiring and contractual authority and also the signatory of the offer letter, emailed Plaintiff acknowledging that the contract is flexible regarding early tenure and promotion after one year if service. Defendant Gort wrote:

> "I understand from Dr. Hadidi [Dean] that you are asking for some written assurance of the early timeline available to you for tenure and promotion. I know that Andrew [HR Representative] also told you that you would be eligible to apply for tenure after one year of service, and eligible for promotion after two complete review processes and thus, two years. We do not indicate specific timelines for tenure and promotion in offer letters, beyond what has already been shared, because we don't want you to be held responsible for a specific timeline if you determine that you are not ready to apply. The contract is clear about the flexibility and we honor the contract."

63. In Early Jan 2024, when Plaintiff applied for tenure and promotion, Defendant Gort changed her mind and claimed there was expectation that Plaintiff be employed for at least three years before applying for tenure.

64. Further, Defendant Gort new assertion in 2024 contradicted what Gort communicated with Plaintiff in March 2021 using email during the job offer discussion.

14

**Tenure and Promotion Timeline Comparators**

65. Moreover, numerous faculty members, including Minjung Park, Sonai Chaudhuri, and Changyu Lou (all are Asians, never reported on protected activities), were permitted to apply for promotion prior to completing three years in rank without objection from Defendant Gort.

66. These facts demonstrate that the purported basis for denying Plaintiff's promotion was inconsistent with university policy and with comparators.

| The 2021 Inducement (Email by the Decision Maker) | The 2024 Retaliation (EEOC Position Statement) |
|---|---|
| "Eligible for tenure after **one year**." | "Had not been employed for the recommended **three years**." |
| "Eligible for promotion after... **two years**." | "Gort Reminded Charging Party of the expectation... at least **three years**." |
| "We honor the contract." | [Characterizing the application as an overreach.] |
| "You were credited with 20 years of experience... converted to the IFO salary schedule." | "She could have turned down the offer." |

67. In early January 2024, Plaintiff submitted her application for tenure and promotion in accordance with the University's established procedures for review and evaluation. On **January 18, 2024**, the department faculty completed their review and voted on Plaintiff's application.

68. The Tenure and Promotion file was available for Defendants Gort and Arthur to evaluate before they started their retaliatory adverse employment action against Plaintiff.

15

## 5. Denial of Access to Personnel Records (2024-current)

69. Despite multiple written requests made to Defendants Gort, Arthur, and MSU Human Resources both before and after Plaintiff termination, Defendants refused to provide Plaintiff access to her personnel and employment records.

## 6. Discrepancy Between Actual Job Posting and Personnel File Records

70. Plaintiff discovered that her personnel file contained a job advertisement for a different position—Assistant Professor of Strategic Management—rather than the actual posting for Assistant Professor of Operations and Supply Chain Management for which she applied, was interviewed, and was hired.

71. Further, personal file showed discrepancy between the credited years of experience confirmed during hiring (20 years) and the listed experience in the file (about 10 years less).

72. Defendants Gort and Arthur as well as HR ignored all emails regarding salary and rank misestimation and refused to correct records.

## 7. Intellectual Property Misappropriation and Misrepresentation

73. Defendants Gort and Arthur confiscated, accessed, distributed and allowed others to access, view, copy, download and use Plaintiff's intellectual property—including research materials and papers, syllabi, PowerPoint slides, Excel Sheets with applications, feedback, discussions, examinations, quizzes, assignments, surveys, questions and answers, curriculum documents, instructional videos, teaching cases, research papers, and related academic materials—without Plaintiff's permission.

16

74. This conduct violated the IFO Contract, the University policy governing intellectual-property ownership and access, as well as applicable state and federal laws protecting intellectual property, academic work, research materials, and copyrighted content. Defendants' unauthorized seizure and dissemination of Plaintiff's intellectual property further demonstrate retaliatory motive, bad faith, and pretext.

**Defendants Gort, and Arthur Knowledge of Plaintiff's Creation and Ownership of Her Intellectual Property**

75. Defendants Gort and Arthur were fully aware that Plaintiff created and owned her instructional materials, including original teaching content and accessible learning resources designed for students with visual impairments.

76. Defendants Gort and Arthur also knew that Plaintiff maintained all her intellectual property, research activities and research papers stored on her personal university password protected account that can only be accessed using Plaintiff's credential.

77. Despite this knowledge, Defendants Gort and Arthur misled the Attorney General's Office and the Minnesota State Universities and Colleges (MNSCU) by making knowingly false assertion that Plaintiff only used "publicly available resources."

**Violation of IFO Contract on Intellectual Property Protection**

78. Defendants Gort and Arthur have knowledge that the IFO contract expressly prohibits them from accessing, downloading, sharing, or allowing others to access, view, download, or use a faculty member's intellectual property—including syllabi—without the faculty member's permission.

17

79. Despite IFO contractual prohibition, Defendants accessed, downloaded, and allowed others to access, download, copy, and use Plaintiff's instructional materials, research content, and course documents without Plaintiff's permission or knowledge.

**Violation of the University Policy on Intellectual Property**

80. Defendants Gort and Arthur conduct violated the university policy 3.26 on intellectual property protection and directly contradicted their later statements to the Attorney General's Office and to MNSCU that Plaintiff's materials were owned by the University. Their presentations were knowingly false and were made to conceal Defendants' breach and violations. Defendants, Min State, and the Attorney General all have access to all university policies. The university policy states:

"**Scholarly works.** Intellectual property rights in scholarly works belong to the faculty member or student who created the work, unless an agreement, sponsorship agreement, or other condition described in Subpart B or C provides otherwise.

**Personal works.** Intellectual property rights in personal works belong to the creator of the work.

**Subpart B. Modification of basic ownership rights.** The general provisions for ownership of intellectual property rights set forth in Subpart A may be modified by entering into a signed written agreement as provided in this subpart, following collaborative discussion among the affected parties, or through the substantial use of resources.

**Subpart C. Collective bargaining agreement:** In the event the provisions of this policy and the provisions of any effective collective bargaining agreement conflict, the collective bargaining agreement must take precedence."

18

## 8. Pattern of Adverse Actions Following Plaintiff's Reports

**December 2021 Irregular Request to Alter Grades C Citing Financial Aid Reasons**

81. In December 2021, Defendants pressured Plaintiff to change the failing grade of student TS—who earned 11.5% of total course points—to a passing grade ("I") without merit in order to preserve the student's financial-aid eligibility and enrollment.

82. Plaintiff was informed that student TS was "connected to staff members who care a lot about her," and that Defendants expected Plaintiff to alter the grade accordingly.

83. University policy requires that a student successfully complete a substantial portion of course requirements, as determined by the instructor, before an "I" grade may be requested or granted.

84. Plaintiff reasonably believed that altering a grade without merit to preserve false financial-aid eligibility and enrollment would violate University policy, federal and state law, and Department of Education regulations. Plaintiff refused to change the grade for these ethical and legal reasons.

85. On December 8, 2021—after the course had concluded and after the student had already failed—Defendant Burgess issued a retroactive accommodation letter at the recommendation of Defendant Sullivan.

86. University policy prohibits retroactive accommodation letters and requires an interactive process supported by appropriate documentation before accommodations may be granted.

19

87. Defendant Burgess requested "flexible attendance," "frequent breaks," and similar accommodations for an online course that required no physical attendance and had already concluded in November 2021.

88. Defendants Burgess and Sullivan knew that the final assessment was posted on December 3rd 2021, and the student failed the class (F, 11.5%).

89. Plaintiff granted student TS with multiple extensions on class activities. The last extension was until Dec. 31 2021. Student TS refused to engage or to submit class work.

90. Defendants Burgess and Sullivan attempted to use the retroactive accommodation letter—issued outside University policy—to pressure Plaintiff to change the grade, and threatened to file a 1B.1 discrimination complaint against Plaintiff if she refused.

91. None of the Defendants had authority to dictate grades, negotiate grades, or evaluate student performance. Their actions were outside the scope of their employment and in direct violation of University policy, IFO contract and academic-integrity standards.

**January 2022-The Union Faculty Association (FA) President Interfered**

92. Plaintiff raised concerns about the grade change mandate and pressure from Defendant Sulivan and Hadidi to the union.

93. In January 2022, the union faculty association (FA) president requested a meeting with Defendants Gort, Sullivan, Hadidi, Misterek and others to discuss their "improper grade change mandate," and how Plaintiff was mistreated because of her protected

20

"proper" refusal to change grades. See Exhibit 11(Email Sent from union FA president addressing improper grade change mandate and mistreating Plaintiff)

94. The Meeting was scheduled for February 2nd 2022. On the day prior to the meeting, Defendant Gort met with Defendants Sullivan, Burgess, and Anderson regarding the upcoming meeting and the issues to be addressed.

**February 2nd 2022 Meeting with Plaintiff, FA President, and Defendants**

95. On February 2, 2022, Defendant Gort attended a meeting with Plaintiff, the Faculty Association President, Maya Sullivan, Kristen Burgess, Susan Misterek, and Roberta Anderson to address Plaintiff's concerns regarding the improper grade-change request for student TS.

96. During the meeting, Plaintiff reported that department chair Susan Misterek had informed her that the University changed student TS's failing grade through a registration appeal for which the student was not eligible, in order to preserve the student's financial-aid eligibility; that student TS was already on academic probation; and that the University relied on a retroactive accommodation letter issued in the second week of December 2021—after the student had already failed the course—to justify the grade change for financial-aid purposes.

97. In response, Defendant Gort aggressively denied that any registration appeal had occurred, denied that student TS's grade had been changed through a registration appeal, denied that the student received a financial refund, and denied that the student had been on probation.

21

98. Defendant Gort further denied that Defendant Sullivan had communicated with the Dean or any other administrator regarding student TS's situation, and denied that any discussion had occurred regarding assigning an Incomplete "I" grade.

99. Defendant Gort informed Plaintiff that the failing grade Plaintiff assigned to student TS "was not changed," despite the University's own registration-appeal records showing that the grade had been changed to a "W" on December 20, 2021.

100. Defendant Gort informed Plaintiff that the failing grade Plaintiff assigned to student TS "was not changed," despite the University's own registration-appeal records showing that the grade had been changed to a "W" on December 20, 2021, and that Defendant Gort had been informed of the grade change using registration appeal at that time.

101. Defendant Gort also stated that there was "no evidence" that Defendant Sullivan had discussed student TS's grade with Defendant Hadidi, Defendant Burgess, or any other individual, even though the registration-appeal form and internal communications later obtained by Plaintiff directly contradicted these denials. See below.

**October 2023 Baseless Reprimand Issued Without Misconduct, Evidence, or Contractual Compliance**

102. In October 2023, Defendant Gort issued Plaintiff a written reprimand alleging a 1B.1 violation based on an investigation orchestrated by Defendant Landreau on April 29, 2022—two weeks after Plaintiff reported 1B.1 and EEO violations and oversight from Defendant Landrieu on April 12, 2022 regarding discriminatory practices in the 2022 DSCI hiring search.

103. Defendants Gort and Josephina were unable to answer any of the questions related to due process, evidence, timing, or why they started an investigation despite

22

there was no official compliant from the student, no misconduct and no basis to investigate.

104. The Faculty Association (FA) President wrote to Defendant Gort summarizing her admissions during the October 13, 2023 meeting. The FA President stated: "In response to my question of what are the extenuating circumstances to justify departure from progressive discipline, you replied that you did not know. You contacted Josefina Landrieu via Teams to determine the circumstances, and she said that it was in her purview to determine the discipline given. This violates the progressive-discipline clause in the contract (Article 24, Section A). Accordingly, I ask that you withdraw the written reprimand."

105. The Faculty Association President further noted that Defendant Landreau had no disciplinary authority under University policy or the IFO contract, and that Defendants were asserting alleged misconduct from 2021 while issuing discipline in October 2023, in direct violation of the University's 60-day resolution requirement.

106. When Plaintiff asked Defendant Landreau questions related to process and decision, Defendant Landreau failed to answer, and Defendant Gort threatened further discipline,

**November 2023 Documents Contradicted Defendant Gort February 2022 Communication**

107. In November 2023, Plaintiff obtained internal University documents that directly contradicted every statement Defendant Gort made during and after the February 2, 2022 meeting regarding student TS. Plaintiff also obtained documents proving that her salary

108. The documents confirm that Student TS grade changed using irregular registration appeal process in December 2021. **See Exhibit** 12 (Registration Appeal- Student TS)

109. The grade appeal falsely cited "university error" as the reason for grade change.

110. Internal records from Metro State University, including a Registration Appeal form, demonstrate that the grade was altered on December 20th 2021 through an "irregular" process involving Defendant Burgess, Defendant Misterek, and Defendant Sullivan. **See Exhibit** 12 (Registration Appeal- Student TS).

111. Exhibit 13 provides Burgess email confirming grade change using registration appeal, financial refund, the university open and paid for a new private class only for student TS.

112. Additional internal MSU documents indicated that Defendants Hadidi, Mistrerek, Kent, and Sullivan met to "find a way to remove [the] F grade from the student transcript" after the Plaintiff refused to alter the academic record and performance.

113. Internal MSU documents further show that on December 21, 2021, Defendant Burgess informed University officials that student TS's grade had been changed to a "W," with a refund of tuition and fees, through a registration appeal falsely citing "university error."

114. In her December 21, 2021 email to Defendants Hadidi, Misterek, and others, Defendant Burgess wrote: "The reasoning behind doing it this way rather than a drop that would erase the course from her transcripts is that if we did that she would have had to return funds that she was awarded." See Exhibit 13 (Burgess Email)

24

115. Defendant Burgess further stated that MSU would open a new course section—funded by MSU using public funds—exclusively for student TS, despite the availability of existing course sections the student could have joined. See Exhibit 13 (Burgess Email – Financial Reasons).

116. Defendant Sullivan stated "the student was on probation," and cited loss of financial aid and declining enrollment as reasons for demanding a grade change. Sullivan further stated Plaintiff should be fired for "not listening to us," despite having no supervisory or grading authority over Plaintiff.

117. The irregular alteration of student TS's academic record to preserve financial-aid eligibility was not an isolated administrative error but a coordinated process that was extensively discussed, planned, and approved by Defendants.

**November 2023 Discovery: Pattern of Misuse of Registration Appeals and Gort Seven Minutes Retaliation for Enforcing Academic Integrity**

118. Since Plaintiff's hiring in 2021, Plaintiff was informed that the University routinely used the registration-appeal process to preserve financial-aid eligibility and enrollment for underperforming students, even though the registration-appeal process is not intended for that purpose.

119. Plaintiff later obtained University data reflecting a similar pattern in another case involving a student in Plaintiff's graduate MBA course, where Plaintiff was the sole instructor of record.

120. In that instance, the student engaged in classroom misconduct, violated academic-integrity expectations, and harassed classmates. Plaintiff reported the misconduct to MBA Director Allen Bellas in February 2022.

25

121. Instead of investigating the misconduct or directing Plaintiff to the applicable University policies, Director Bellas instructed the student to file a registration appeal to withdraw from the course and obtain a tuition refund, thereby bypassing University policies and Plaintiff's academic authority.

122. In February 2022, Defendant Burgess processed and approved this second irregular registration appeal by designating it as a "university error," marking the second such false designation within a two-month period.

123. Defendant Burgess then informed Defendant Gort of the matter and reported that Plaintiff had documented another student's violations of academic integrity, professionalism, and classroom conduct.

124. Within seven minutes of receiving Burgess's email, Defendant Gort directed Defendant Hadidi, Plaintiff's immediate supervisor, to issue a baseless "letter of expectations" to Plaintiff—outside any policy, contract, or due-process protections.

125. Plaintiff is in possession of the February 2022 emails from Defendant Burgess to Defendant Gort, as well as Defendant Gort's email sent seven minutes later to Defendant Hadidi, which contains unsupported and retaliatory instructions.

126. In her email to Hadidi, Defendant Gort directed Defendant Hadidi to tell Plaintiff that she "cannot deny disability accommodations to students," despite Defendant Gort's full knowledge that the student at issue had never claimed a disability, was not registered with the Center for Accessibility Resources, had not requested accommodations. Defendant Gort also knows that the student had engaged in

academic-integrity violations, classroom misconduct, and harassment of classmates and Plaintiff.

127. These emails demonstrate that Defendant Gort knowingly issued a false and retaliatory directive and attempted to create a disciplinary record against Plaintiff based on a fabricated disability-accommodation issue.

128. Instead of addressing Defendant Burgess's interference with faculty authority, misuse of the registration-appeal process, and disregard for academic-integrity violations, Defendant Gort took adverse action against Plaintiff for enforcing University policy.

129. Although Defendant Hadidi did not issue the letter, he later cited this incident as evidence that Plaintiff "did not meet expectations" in service in his April 2022 feedback.

130. In late November 2023, Plaintiff discovered and obtained documentation confirming the University's systemic misuse of the registration-appeal process, including copies of the registration-appeal forms and internal email communications among Defendants.

131. On December 5 and 6, 2023, Defendant Gort learnt that Plaintiff is in possession of these documents.

**November 2023 Discovery: Personnel File Review Reveals Experience and Salary Miscalculations**

132. In November 2023, at the recommendation of the Faculty Association, Plaintiff obtained and reviewed her personnel file and discovered multiple discrepancies affecting her credited years of experience and resulting salary placement. Plaintiff

27

immediately contacted the union to address these discrepancies and their impact on her compensation.

133. On November 24, 2023, the union representative confirmed by email that when Plaintiff's 12.75 years of experience were entered into the University's salary algorithm, the system predicted a placement between Step 28 and Step 32. Plaintiff then asked how the same algorithm could predict only one additional step—between Step 30 and Step 33—for more than 20 years of full-time experience, noting that such a result was mathematically inconsistent and indicated that the algorithm was not functioning correctly.

**December 5th and 6th 2023 University Documents Contradicted Gort's Prior Communications**

134. On December 5, 2023, Plaintiff informed Defendant Gort that she had obtained internal University documents confirming that student TS's grade had been changed in December 2021 through an irregular registration-appeal process—falsely citing "university error" to preserve financial-aid eligibility—and that these documents directly contradicted Defendant Gort's denials to Plaintiff and to the Faculty Association President during the February 2, 2022 meeting.

135. On December 6, 2023, during a meeting of the Academic Quality Council—of which both Plaintiff and Defendant Gort were members—Plaintiff requested that the University conduct a cost-benefit analysis of useless academic programs that wastes state and federal resources without providing meaningful educational benefit to students.

28

136. Plaintiff also raised concerns regarding the creation of unnecessary faculty positions, the hiring of unneeded faculty despite declining enrollment, the presence of "ghost students" in her courses, and the practice of opening duplicative courses under different names, which distorted instructional-need data, undermined academic quality, and further waste more of state and federal resources.

**Mid December 2023**

137. Around mid-December 2023, faculty and administrators received "anonymous" letters containing the same information Plaintiff had disclosed privately to Defendant Gort during the confidential December 6th 2023 meeting in which Gort asked Plaintiff about her external employment at Georgetown University.

138. The letters were mailed from St. Paul, Minnesota, where Defendant Gort's office is located, to numerous faculty members within the college and across the university.

139. The letters also contained a unique search syntax that, upon information and belief, was generated by Defendant Hadidi using his MSU workstation.

140. When Plaintiff informed Defendant Hadidi about the search syntax and that he was the individual who created and disseminated the letters with the search syntax, Defendant Hadidi became visibly alarmed and immediately offered a false explanation, claiming that "Hamilton" authored and sent the letter. This explanation was impossible: Hamilton was in Washington, D.C. at the time, not in Minnesota, and Defendant Hadidi is the creator of the search syntax embedded in the letter.

141. Taken together, the timing of the communication, the nature of the information included, and the circumstances of its transmission support an inference that the

communication may have originated from individuals with access to Plaintiff's disclosures and was circulated shortly after Plaintiff engaged in protected activity.

**Mid December 2023 to Early January 2024: semester break. No duty days.**

**Early January 2024**

Early January 2024, Plaintiff was informed that Defendants Gort and Arthur were circulating information about Plaintiff external employment during university meetings and committees.

**January 18th 2024**

142. During the tenure and promotion voting meeting on January 18th 2024, Defendant Park disclosed to department faculty, verbatim, the confidential statements, word by word, made during Plaintiff's December 6th 2023 meeting with Defendant Gort regarding Plaintiff's external employment.

143. Defendant Park discouraged faculty from supporting Plaintiff's tenure and promotion application and solicited calls to faculty to get them to sign a letter containing false defamatory statements that Defendant Park wrote.

144. Defendant Park's conduct breached the IFO contract, violated University policies on collegiality, confidentiality, and information privacy, and improperly interfered with Plaintiff's tenure, promotion, and salary advancement. Defendant Park also held Plaintiff to standards not applied to other faculty members.

145. Plaintiff reported Defendant Park's conduct to the union, HR, and Defendants Gort and Hadidi. Exhibits 14 and 15 includes Plaintiff's January and February 2024

30

complaints about Minjung Park's conduct to Defendant Gort, HR, and the union documenting these violations.

146. Instead of addressing Defendant Park's misconduct, Defendants Gort made irregular and incorrect assertions regarding the IFO contract's tenure and promotion requirements, including claiming that Plaintiff was required to provide "indefinite access" to her tenure and promotion file and asserting a "three full years in service" requirement that was not applied to Defendant Park or other faculty. See Table 1

147. Shortly after the January 18, 2024 tenure and promotion misconduct, Defendants Gort, Arthur, and Hadidi granted Defendant Park tenure, a sabbatical, and salary increases.

**January 28th – February 1st 2024**

148. On January 28th 2024 and February 1st 2024, Plaintiff contacted the Union and Minnesota Department of Human Rights with Discrimination and Retaliation complaints after enduring years of escalating abuse, discrimination, and retaliation by Defendant Gort and her subordinates following Plaintiff's repeated protected reports. (See Exhibits16 and 17)

**February 9th 2024**

149. On February 9th 2024, Plaintiff reported to Defendants Gort and Hadidi concerns regarding conduct by Defendant Park that Plaintiff reasonably believed raised issues of disparate treatment based on ethnicity and fairness in employment-related opportunities. These concerns included:

(a) invitations extended by Defendant Park to students of a particular ethnic background (Asian students) to informal gatherings at her residence shortly before

31

teaching evaluations, which Plaintiff believed could raise concerns regarding transparency and potential influence on evaluation processes;

(b) alleged limitations in invitations to students of certain ethnic backgrounds, which Plaintiff believed raised concerns regarding equal treatment; and

(c) allocation of teaching opportunities over time in a manner that Plaintiff alleges resulted in increased compensation for Defendant Park, while similar opportunities were denied to Plaintiff and others.

## February 18th Plaintiff's Medical Deterioration and Notice to Defendant Gort Following Retaliatory Conduct

150. On February 18, 2024, Plaintiff reported to Defendant Gort that her medical condition had worsened as a direct result of the ongoing retaliation and discrimination she was experiencing.

151. Plaintiff informed Defendant Gort that her symptoms escalated after Defendant Hadidi publicly yelled at her, an incident that caused significant distress and contributed to Plaintiff's deteriorating health. See Exhibit 24

## March 1st 2024 Retaliation: Reopening a Closed Investigation, Absence of Due Process, Reverse Decision

152. On December 6th 2023, Defendant Gort concluded the meeting, regarding external employment, by asking asked if Plaintiff was going to teach classes at GU in Spring 2024 and Plaintiff said "No." Gort indicated moving forward, if Plaintiff decided to have external job, she can inform Gort or inform Dean Hadidi.

153. Following Plaintiff's protected disclosures and whistleblowing activities in December 2023 and early 2024—including evidence Plaintiff obtained showing that Defendant Gort had provided incorrect and misleading information regarding student

32

TS—Defendant Gort abruptly requested a meeting and refused to disclose the purpose or subject of the meeting.

154. By calling a meeting without notice of the allegations or issues to be discussed, Defendant Gort denied Plaintiff the procedural protections required under University policy and the IFO contract.

155. The meeting was scheduled on March 1st 2024, Gort so said "it is investigation meeting" and refused to disclose what it was about, raising concerns about due process.

156. During the meeting, Plaintiff discovered that it was about external employment that Gort already concluded with "no violation" on December 6th 2023.

157. Defendant Gort made accusation that Plaintiff was teaching classes in Spring 2024 at GU. Plaintiff confirmed that Plaintiff did not teach any classes in Spring 2024 at GU.

158. Defendant Gort made another accusation that Plaintiff was teaching five to six classes per semester (20-24 credit hours per semester) at GU. Plaintiff confirmed that Plaintiff did not teach these many classes in any semester at GU.

159. Plaintiff indicated she was thinking it was an investigation into Plaintiff's complaints about Defendants Hadidi and Park.

160. Gort said she needed to investigate further to verify that Plaintiff was not teaching classes in Spring 2024.

161. Plaintiff communicated forthrightly and correctly and told Gort "I am hundred percent certain that I am not teaching at GU in Spring 2024."

33

162. Defendant Gort then recommended Defendant Arthur to terminate Plaintiff over external employment that Gort previously concluded non violative for reasons listed.

163. This sudden and inconsistent shift in position occurred immediately after Plaintiff informed Gort, on or about December 6th 2023, that Plaintiff obtained University documents revealing procedural irregularities and misreporting of performance and altering grades, of former Fall 2021 students of Plaintiff, to maintain false financial aid illegibility and enrollment. Semester break started from mid-December 2023 till early January 2024- No duty days.

164. The temporal proximity between Plaintiff's protected activity and Defendant Gort's renewed investigation, combined with the reversal of her earlier determination, constitutes strong evidence of retaliatory motive and pretext.

**Reporting on Equal Employment Opportunity-DSCI Hiring Search**

165. Another major contributor to the series of adverse actions is the EEO violation that Plaintiff witnessed, opposed and reported on April 12th 2022. EEO violations took place within the DSCI hiring search committee that Plaintiff was a member of where qualified minority applicants were excluded from the hiring search to include unqualified a ones. The details are:

166. On or about April 12th 2022, Plaintiff reported concerns regarding discrimination and Equal Employment Opportunity (EEO) compliance under Policy 1B.1 to Defendant Josefina Landrieu, Vice President of Equity. A copy of this communication is attached as Exhibit 18.

34

167. The DSCI hiring search pool excluded qualified minority candidates and included unqualified candidates. Candidates' qualifications were misreported by the equity champion.

168. Defendant Landrieu was responsible for reviewing hiring processes for compliance with EEO and related policies. Defendant Landrieu approved the biased pool and never conducted any investigation.

169. On April 13th 2022, the next day Plaintiff raised EEO violation: Defendants Landrieu, Gort and Hadidi removed Plaintiff from the hiring search committee and replaced Plaintiff with unqualified male (Duncan), outside Plaintiff protected class. See Exhibit 19 B (email Communication from Landeau removing Plaintiff from hiring search)

170. On April 13th 2022, Defendant Mistrek, the DCSI hiring search chair and department chair, removed Plaintiff from summer teaching that was established months prior. This resulted in Plaintiff summer pay reduction by 90 %. See Exhibit 21 A and 21 B (Emails to Hadidi informing him about the retaliation and summer teaching and pay reduction)

171. Defendant Misterek was a friend of one of the unqualified candidates (Suanne Barthol) that Mistrerk advanced to the pool. Plaintiff is informed and believes that Defendant Misterek promised donation to Defendant MSU.

172. Defendant Gort ended up offering the job to the unqualified candidate, Suanne Barthol.

173. On April 29th 2022, within two weeks of the EEO violation report, Defendant Landrieu accused Plaintiff of 1B1 violation. See Exhibit 22 (Email response to Meagan Sinclair telling her that Plaintiff already reported on 1B1 violation not the opposite)

174. On April 29th 2022, Defendant Hadidi also informed Plaintiff that Plaintiff did not meet his service expectations because of the EEO hiring search concerns Plaintiff reported.

175. Defendant Hadidi continued his adverse actions by excluding Plaintiff from meetings, all hiring search committees, and leadership opportunities.

176. Defendant Hadidi denied all 4030 grants application provided by Plaintiff, summer teaching equivalent to others.

177. Defendant Hadidi continued holding Plaintiff to standard different from others.

178. In Spring 2023, Plaintiff was nominated for Board of Trustee Excellence of teaching Awards. In Spring 2023, Defendant Hadidi told Plaintiff that he "cannot evaluate Plaintiff's teaching because Plaintiff did not provide IDEA evaluation," despite Plaintiff provided screenshot of her IDEA evaluations. Defendant Hadidi was able to evaluate others such as Minjung Park who did not provide even a screenshot of her IDEA evaluations.

179. In late April -late May 2023, Plaintiff reported to Defendant Gort and Hadidi about the discrimination and retaliation that Hadidi exposed her to since April 2022.

180. Semester Break started in May 2023 till Mid August 2023

36

181. In August 2023, Plaintiff was informed that Defendant Landeau, acted outside her scope of employment, and recommended issuing a progressive discipline-a written reprimand to Plaintiff.

## 9. External Employment (IFO Contract, Comparators, Shifting Reasons, and Post Hoc Rationalization)

**IFO Contract**

182. **Article 27 A of the IFO contract** does not prohibit external employment: [**Article 27 A**- A faculty member shall be free to accept such external employment as does not interfere with the full and proper performance of duties for the respective university as outlined in this subdivision.]

183. The IFO contract does not identify external employment as misconduct and does not authorize discipline—let alone bypassing the progressive discipline clause of the IFO contract to termination—on the basis of outside employment. Under the IFO contract, discipline is progressive (Oral, written, suspension, and termination) and may be imposed only upon a finding of misconduct following due-process procedures.

184. Nevertheless, Defendants Gort and Arthur terminated Plaintiff based on external employment that numerous similarly situated employees also possessed. These comparators (same school, department, and bargaining unit) maintained external positions for years inside the US and abroad, yet none were investigated, disciplined, or subjected to adverse action.

37

185.  Defendants' decision to terminate Plaintiff for conduct routinely permitted for other faculty members further demonstrates selective enforcement, discriminatory treatment, and retaliation following Plaintiff's protected activities.

186. Defendants Gort and Arthur asserted that Plaintiff had been "fired" from her external employer, Georgetown University (GU). This assertion is materially false. Defendant Gort knew that Plaintiff had never been terminated from GU. Defendants' reliance on a knowingly false allegation to justify termination further demonstrates pretext and the absence of just cause.

**Defendant's EEOC position statement regarding IFO**

187. Defendants' EEOC position statement simultaneously acknowledged that IFO contract allows faculty to engage in outside employment so long as it does not interfere with their duties, while asserting—without identifying any interference— that Plaintiff "maintained external employment in violation of the Contract." These internally inconsistent statements demonstrate that Defendants' justification lacks factual and contractual basis and constitute evidence of pretext. This contradiction demonstrates that Defendants' stated justification lacks factual and contractual basis.

**Post Hoc Fabrication of Irrelevant "Login Count"**

188.    During the EEOC investigation against MSU, Defendant Gort provided the Assistant Attorney General (AAG) with a post-hoc, fabricated rationale claiming that Plaintiff's external employment interfered with her duties based on "login counts" to one of the numerous instructional platform and websites that Plaintiff used. This metric was

38

irrelevant, misleading, and never previously raised in any meeting, notice, or communication.

189.   Defendant Gort is well aware that login counts does not capture performance, workload, or fulfillment of duties because : (1) Plaintiff use multiple platforms—including Zoom, email, publisher systems, and external instructional tool, (2) Plaintiff spends off line time grading and assessing performance, preparing teaching, service  and research material, responding to students concerns, and (3) Plaintiff attend in person meetings and seminars to perform their responsivities including union, university, school, and department meetings and seminars to perform their responsibilities. None of these activities generate LMS login data.

190. Defendant Gort never raised the "login count" theory during any December 2023 or March 2024 meetings, nor did Defendants Gort and Arthur reference it in the March 2024 intent-to-terminate letter, the April 2024 termination letter, or during the 2024 MNSCU investigation against Gort and Arthur.

191. Because this metric is meaningless, misleading, and was never part of any internal process or policy, the Attorney General's reliance on this post-hoc rationale lacks probative value and does not demonstrate interference with Plaintiff's duties. The absence of any independent investigation by the Attorney General's office leaves Plaintiff's discrimination and retaliation claims properly before this Court.

**Concealing of Exculpatory Performance Evidence**

192. By selectively presenting the learning management system (LMS) login counts and mischaracterizing it as a sole engagement metric—while omitting the numerous platforms, tools, online discussion and analysis, grading, preparing courses and free

39

teaching material, Zoom meetings, office hours, optional extra free classes and duties that constitute the majority of instructional, research and service work—Defendant Gort presented to the AAG and EEOC an incomplete and misleading picture of Plaintiff's performance.

193. By relying on log-in counts as evidence while failing to provide accurate and meaningful measures of instructional, research and service activities, Defendant Gort concealed exculpatory evidence, creating a misleading justification for termination.

194. Defendant Gort concealed Plaintiff's volunteer extra work with external organizations such as Mayo Clinic to support student internships, employment, and instructional enrichment. These contributions were known to Defendants Gort, Arthur, and Hadidi but were intentionally omitted.

195. Defendant Gort further concealed Plaintiff's positive performance indicators, including student awards, expressions of appreciation, extracurricular contributions, and extensive volunteer service to the department, school, and University. Plaintiff was nominated for the Board of Trustees Excellence in Teaching Award in 2023.

196. Plaintiff was also informed that Plaintiff had been nominated for additional awards in 2024-during the period in which Defendants were preparing to terminate her employment. Defendants including Defendant Gort were aware of these recognitions but intentionally omitted them from all internal and external evaluations, including communications with the EEOC and the Attorney General's Office. This concealment of exculpatory performance evidence further demonstrates pretext and retaliatory motive.

40

**Comparators Evidence and Defendants' False Statements**

197. The Defendant EEOC position statement regarding absence of comparators is inconsistent with the information available to Defendants since 2023 through 2024.

198. Plaintiff provided a long list of comparators-verbally and in writing-to Defendants Gort, Arthur, HR, and MNSCU from December 2023 through December 2024 (See Exhibit 23).

199. Defendants Gort and Arthur declined discussing comparators or even investigating their external employment.

200. This contradicts Defendants' later assertion to the AAG that "Plaintiff has not presented a similarly situated employee" is false.

201. All comparators were working in the US and abroad without permission as Defendant Gort previously communicated.

202. This inconsistency further demonstrates pretext and undermines the credibility of Defendants' stated reasons for their actions.

**Comparators: Same School, Same Supervisor, Same Bargaining Unit:**

203. Most of the comparator employees identified by Plaintiff worked in the same school, department, and under the same supervisor (Defendant Hadidi) as Plaintiff, and were members of the same IFO bargaining unit. These comparators differ from Plaintiff in ethnicity, color, national origin, disability status, and history of protected activity. None had engaged in protected reporting. See Table 3 and Exhibit 23.

41

204.    These similarities in role and structure, combined with differences in protected-class status and protected activity, make the comparators appropriate for assessing disparate treatment.

**Comparators Working Abroad in Violation of State and University Policy**

205.    **Comparators Working in China:** Working abroad or working from outside the US, while maintaining full time employment at MSU is prohibited by the university and the state. Several comparators from the same department maintained external employment, both within the United States and abroad (including in China), for years without permission. See Exhibit 23. These comparators performed their MSU responsibilities remotely from China while simultaneously holding full-time, benefits-eligible external positions.

206. Despite these clear violations, Defendants did not initiate any investigations into these comparators. Defendants granted them tenure, promotions and salary increase to these comparators. In contrast, Defendants Gort and Arthur aggressively pursued termination of Plaintiff for employment in the US, which that is not prohibited. This selective enforcement demonstrates discriminatory and retaliatory motive, particularly following Plaintiff's protected activities.

207. The IFO contract contains no provision creating an exception for faculty from the nursing school. Defendants' unsupported assertion therefore does not rebut Plaintiff's comparator evidence and is inconsistent with the contractual framework governing faculty employment.

**December 6th 2023 Gort Concluded No Violation-No Discipline wrt External Employment**

**Comparators and Contract Clause Presented to Defendant Gort on Dec. 6th 2023:**

208. On December 6, 2023, during a meeting with Defendant Gort that was also attended by a union representative, Gort asked Plaintiff about her external employment at GU and if Plaintiff informed Defendant Hadidi about it. Plaintiff and the union representative directed Defendant Gort to Article 27 of the IFO contract, which expressly permits external employment.

209. The union representative read it out aloud to Defendant Gort.

210. Plaintiff further identified multiple comparator employees (same school, same supervisor), from outside her protected class, who maintained external employment in the United States and abroad (including China) for years such as Loi Nguyen, Duncan Campbell and Changyue Luo.

211. Plaintiff also referenced comparator Sonai Chaudhury who, maintained employment at the University of Minnesota while being a full-time salaried employee at MSU. Chaudhury was granted tenure, promotion, and raised. Chaudhury was also granted sabbatical leave with pay meant to serve MSU. Chaudhury was also employed as a salaried employee by the University of Minnesota during her MSU paid sabbatical, and was actively search, during her sabbatical, and was being interviewed for another job outside MSU. Chaudhuri subsequently pursued employment opportunities with another university right after her sabbatical ended. Following her departure, Chaudhuri was later rehired by MSU as an adjunct faculty member with no identified need for her position.

43

**December 2023 Gort Concluded No Violation No Discipline Over External Employment**

212. Based on this information presented by Plaintiff and Union representative — including Article 27 of the IFO contract and the list of comparator employees— Defendant Gort concluded that Plaintiff had not violated any policy and hat no discipline was warranted in light of what Defendant Gort acknowledged: (1) the applicable IFO contract does not prohibit external employment; and (2) the contract provisions regarding prior approval or permission are ambiguous.

213. Despite Defendant Gort was informed about comparators who had engaged in external full-time employment in the US and abroad—some were working remotely from China, Defendant Gort did not initiate any investigation into their conduct.

214. Later in the day December 6th 2023, Gort met Plaintiff during the Academic Quality and Innovation Council. Plaintiff raised concerns about running useless programs that wastes public fund and does not help students. Plaintiff requested cost-benefit analysis report and review of programs.

215. The university went to the semester break, no duty days, between Mid December and Early January.

28. In Jan 2024, Plaintiff raised concerns that Defendants Hadidi, Park, and Gort approved an unneeded and academically unjustifiable faculty job opening that wastes public fund money and waste university resources and facilitate unfit candidate to make it to the final hiring stage. They facilitated opening these positions for no academic reason despite the declining enrollment and without any legitimate justification other than certain benefits to Hadidi, Park who obtained financial benefits for facilitating this in

44

her forced hiring as a department chair and her forced assignment as search committee chair despite her lack of qualification and experience. Her assignment to these positions was made by Hadid and Gort.

## 10. Shifting Main Termination Reason After Confrontation With Comparator Evidence

### Second False Reason: Plaintiff Protected Refusal

216. During the independent investigation conducted by Minnesota State Colleges and Universities in late 2024 into the conduct of Defendants Gort, Arthur, and Hadidi, Defendant Arthur was confronted with comparator evidence that Plaintiff had provided to them before termination.

217. Defendant Arthur then shifted her main reason for termination to another reason related to Plaintiff's December 2021 protected refusal of to alter academic records, without merits, to preserve financial aid eligibility and enrollment.

218. In December 2021, Plaintiff was asked to change the failing grade of student TS—who had earned an F (11.5%) after refusing to complete any work despite multiple extensions—into a passing grade without merit. Administrators told Plaintiff that an administrator "cares a lot about student TS" and that the student was "busy running her restaurant." Plaintiff reasonably believed that altering the grade, without merit, to preserve enrollment and financial-aid eligibility would be fraudulent to the department of education and government and violates university policy.

219. Defendant MSU then, through Maya Sullivan and Kristin Burgess, drafted a retroactive accommodation letter in the second week of December 2021 to student TS after the class ended in November 2021 and after student TS failed the class.

45

220. The retroactive letter required "flexible attendance" and "frequent breaks," even though the course was fully online and attendance was not required. The retroactive letter was issued without any interactive process or required documentation.

221. Defendant MSU later stated that the retroactive accommodation letter did not include a "grading recommendation" because doing so would "cause confrontation with the union which would view such a request as irregular and something faculty had every right to resist." Thus, they asked Plaintiff to change grades of student TS verbally.

222. Defendant MSU denied accommodating students with extenuating circumstances who earned about 60 % of total class points. Student TS earned F (11.5 %).

**Retroactive Accommodation Violated University Policy and Was Misused to Create a False Narrative**

223. Issuing a retroactive accommodation under these circumstances violated University policy, which expressly provides that (1) accommodations may never be retroactive, and (2) accommodations may not fundamentally alter a program or compromise academic integrity. Plaintiff reasonably believed that altering the grade from F to a passing grade without merit—where the student refused to submit any work despite months of extensions—would constitute a fraudulent act. Defendant Arthur later reframed Plaintiff's protected refusal in December 2021 as "Plaintiff denied accommodation," even though the retroactive accommodation letter was issued after the class ended, violated policy, and did not include any grading recommendation. Defendant Arthur's shifting explanation further demonstrates pretext.

224. Another instance of a ghost doctoral student took place in December 2021. Plaintiff also raised concerns over granting grades to a "ghost doctoral student" who did not

46

show up to any class meeting, did not do any work throughout the semester, and was not responding to emails. The department chair asked that Plaintiff to assign a grade for the student despite the no show claiming that doctoral students dissertation can be finished in subsequent semesters. The student finally responded, through email, weeks after the semester stating that the student drafted an email that the student was planning on sending to the Plaintiff during the semester but the student forgot to "hit the send button." Defendants Hadidi regarded the student statement as a valid reason to excuse her absence, assign passing grade, and regard the "no show student" as "attending student."

225. A third situation is related to an MBA student who was reported by her African American colleague over mistreatment and targeting them.

226. In late 2023, Plaintiff obtained University documents proving that the student's grade had been changed on December 21, 2021 through an irregular registration-appeal process that falsely claimed "University error," without the required documents in order to preserve the student's financial-aid eligibility in violation of state and federal law. Registration appeal cannot be made for students who partially attended the class, thus it was another irregular act committed by the Defendants for financial reasons. Registration appeal can only be made for students who have not attended the course. Defendant Gort was notified of the initiation of the [irregular], the ineligibility of the suspended student to registration appeal and the resulting fraudulent representation of W on the student's transcript, using the university resource and public fund to open a private class for student TS, yet in February 2022 Gort informed Plaintiff and the Faculty Association that no registration appeal took place, no grade change, and that W does

47

not exist on student TS transcript for Plaintiff class. The grade change was initiated, processed, approved, or communicated to the same individuals who pressured Plaintiff to alter the grade—including Defendants Gort, Hadidi, Sullivan, Burgess, and Misterek—further demonstrating coordinated misconduct and abuse of the university polices and resources.

227. It is worth noting that Plaintiff obtained university documents that prove that the student's grade changed on December 21st 2021 using "the irregular" registration appeal, that falsely claimed a "university error" to preserve financial aid eligibility with knowledge and approval from Defendant Gort since December 2021. Thus, contradicted Defendant Gort February 2022 evasive misleading denial that student TS submitted a registration appeal, and the grade change for financial aid.

## 11. Denial of Reasonable Accommodation, Due Process, and Wrongful Termination

228. Plaintiff was asked by Defendant Gort to a meeting on March 1st 2024 despite Gort knew that Plaintiff was sick and experiencing flare up.

229. Plaintiff reasonably believed the meeting was intended to investigate the complaint Plaintiff had raised.

230. Defendant Gort refused to disclose the purpose of the March 1st 2024 meeting.

231. Defendant Gort implied that the meeting was an investigation initiated by Gort against Plaintiff and refused to postpone the meeting despite Defendant Gort previous knowledge about Plaintiff's medical condition since April 2023.

48

232. Plaintiff also had COVID, hay fever, headache, high eye pressure and blurred vision, and was not able to talk properly or focus during that time.

233. Defendant Gort refused to postpone this meeting for few days till Plaintiff feel better.

234. Defendant Gort forced Plaintiff to either meet on the date Gort decided, March 1st 2024, or to impose discipline.

235. Defendant Gort stated, in EEOC position statement page 5, "Charging Party responded that her medical condition was from harassment from MSU administrators [Defendant Hadidi.]" Despite knowing about the medical condition of Plaintiff, Gort denied postponing the non-urgent and non-procedural March 1st 2024 meeting for few days or engage in interactive process.

236. During that meeting, Plaintiff discovered that Defendant Gort had reopened an investigation regarding Plaintiff's external employment, which had originally been conducted in December 2023 and closed as non-violative and non-disciplinary.

237. Defendant Gort failed to answer questions why she reopened the investigation and Plaintiff reminded her that the issue had already been discussed and resolved.

238. Plaintiff was thus confronted with an investigation that was already concluded, without notice, justification for reopening the investigation, or opportunity to respond, effectively denying Plaintiff her right to due process and exposing her to adverse employment actions under misleading pretenses.

239. This conduct was also in violation of the university policy.

49

240. Defendant Gort refusal to identify the basis for reopening the investigation, combined with the absence of any new evidence and the timing immediately after Plaintiff disclosed documents contradicting the University's and Gort prior statements regarding grade change and financial aid, demonstrates that the reopening was pretextual and undertaken in retaliation for Plaintiff's protected disclosures.

241. During the March 1st 2024 meeting, Defendant Gort insisted that Defendant Gort had downloaded the documents she was presenting from Plaintiff's external employer's website.

242. Defendant Gort statement was false. She provided different account to attorney general office. A colleague already showed Plaintiff one of the documents that Gort claimed downloaded and they informed Plaintiff that they received this document around Mid December 2023 using USPS mail sent from St. Paul campus where Defendant Gort's office is located.

243. The document contained a written manmade version of the information that Plaintiff communicated with Defendant Gort in early December 2023 regarding Plaintiff's external employment.

244. Defendant Gort insisted that the downloaded it despite Plaintiff questioned the authenticity and availability of those documents and indicated that some of the documents are manmade documents and others were not publicly accessible.

245. In 2025, in a subsequent statement to the Attorney General Office during EEOC investigation, Defendant Gort stated that Gort received the documents through a USPS letter in mid-December 2023- not that she downloaded.

50

246. Defendant Gort and Arthur refused to provide Plaintiff with any evidence, documents, material, data related to the termination, the documents that Gort claimed downloaded from employer website.

247. Termination did not even follow due process in addition it was retaliatory.

248. They failed to provide evidence on the new false accusations made by Gort and communicated during the "investigation" meeting.

249. They refused to provide Plaintiff with investigation report that the claimed conducted.

250. They refused to provide the Zoom recording of the March 1, 2024 meeting that Defendant Gort promised to make available to Plaintiff right after the meeting.

251. They failed to provide Plaintiff with her Personnel file.

## CAUSES OF ACTION

Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein under all claims.

### COUNT 1 — Title VII Retaliation

42 U.S.C. § 2000e-3(a)

1. Plaintiff engaged in protected activity by reporting discrimination, retaliation, procedural violations, and misconduct to University officials, including disclosures in April 2022, December 2023, and early 2024.

2. Plaintiff also opposed discriminatory hiring practices in the DSCI search and reported violations of 1B.1 and EEO policies.

3. Defendants took materially adverse actions against Plaintiff, including initiating a retaliatory 1B.1 investigation, issuing a baseless written reprimand, circulating or enabling circulation of an anonymous defamatory letter, interfering with Plaintiff's tenure review, subjecting Plaintiff to hostile treatment, and disregarding procedural protections.

4. There is a causal connection between Plaintiff's protected activity and the adverse actions, as evidenced by temporal proximity, shifting explanations, procedural irregularities, and Defendants' inability to articulate any legitimate basis for discipline.

5. As a result, Plaintiff suffered economic harm, reputational damage, emotional distress, and other compensable injuries.

## COUNT 2 — Title VII Discrimination

42 U.S.C. § 2000e-2(a)

1.  Plaintiff is a member of a protected class and was qualified for her position.

2.  Defendants subjected Plaintiff to disparate treatment, including unequal pay, unequal rank assignment, and adverse employment actions not imposed on similarly situated faculty.

3.  Defendants' actions were motivated, at least in part, by Plaintiff's protected characteristics or by stereotypes and biases related to those characteristics.

4.  Plaintiff suffered economic, professional, and emotional harm as a result.

## COUNT 3 — ADA Retaliation

42 U.S.C. § 12203

1.  Plaintiff engaged in protected activity under the ADA by reporting on February 18, 2024 that her medical condition had worsened due to ongoing retaliation and hostile conduct, including Defendant Hadidi yelling at her in public.

2.  Defendants were aware of Plaintiff's medical condition and her disclosure.

3.  Following this disclosure, Defendants escalated retaliatory actions, including renewed investigations, hostile treatment, and interference with Plaintiff's employment conditions.

4. Defendants' actions would dissuade a reasonable employee from engaging in protected ADA activity.

5. Plaintiff suffered harm, including worsening medical symptoms, emotional distress, and economic losses.

---

## COUNT 4 — ADA Failure to Accommodate / Interference

42 U.S.C. § 12112(b)(5)

1. Plaintiff notified Defendants of a medical condition exacerbated by workplace retaliation and stress.

2. Defendants failed to engage in the interactive process, failed to provide reasonable accommodations, and instead intensified retaliatory conduct.

3. Defendants interfered with Plaintiff's ADA rights by discouraging or penalizing her for disclosing her medical condition.

4. Plaintiff suffered harm, including deterioration of her health and loss of employment benefits.

---

## COUNT 5 — Rehabilitation Act Retaliation

29 U.S.C. § 794 & § 794(d)

1. Defendant Metropolitan State University receives federal financial assistance.

2. Plaintiff engaged in protected activity by disclosing a disability-related medical condition and reporting retaliation that worsened her symptoms.

54

3. Defendants retaliated against Plaintiff by escalating adverse actions after her disclosure.

4. Plaintiff suffered damages as a result.

---

### COUNT 6 — 42 U.S.C. § 1981 Retaliation

1. Plaintiff engaged in protected activity under §1981 by opposing discriminatory hiring practices and reporting race-related and national-origin-related irregularities in the DSCI search.

2. Defendants retaliated against Plaintiff by initiating a baseless 1B.1 investigation, issuing an untimely reprimand, interfering with tenure review, and subjecting Plaintiff to hostile treatment.

3. Defendants' actions were motivated by Plaintiff's protected opposition to discrimination.

4. Plaintiff suffered economic, reputational, and emotional harm.

---

### COUNT 7 — 42 U.S.C. § 1983 — Procedural Due Process Violations

1. Plaintiff had constitutionally protected property and liberty interests in her employment, reputation, and contractual rights under the IFO Agreement.

2. Defendants, acting under color of state law, deprived Plaintiff of due process by imposing discipline without notice, without identifying misconduct, without evidence, without authority, and in violation of required procedures and timelines.

3. Defendants' actions caused Plaintiff economic, professional, and emotional harm.

---

## COUNT 8 — 42 U.S.C. § 1983 — First Amendment Retaliation

1. Plaintiff engaged in protected speech on matters of public concern, including reporting misuse of public funds, irregular grade changes, ghost students, duplicative courses, and academic integrity violations.

2. Defendants, acting under color of state law, retaliated against Plaintiff for this protected speech.

3. Defendants' retaliatory actions would deter a person of ordinary firmness from engaging in protected speech.

4. Plaintiff suffered damages as a result.

---

## COUNT 9 — False Claims Act Retaliation

31 U.S.C. § 3730(h)

1. Plaintiff engaged in protected activity under the FCA by reporting conduct that could constitute fraud on the federal government, including irregular grade changes affecting financial aid, ghost students, and misuse of federally funded programs.

2. Defendants knew of Plaintiff's protected activity.

3. Defendants retaliated by issuing baseless discipline, interfering with tenure review, and subjecting Plaintiff to hostile treatment.

4. Plaintiff suffered economic and non-economic harm.

---

## COUNT 10 — FERPA-Based Retaliation / Unauthorized Disclosure (via §1983)

---

## COUNT 11 — Minnesota Whistleblower Act

Minn. Stat. § 181.932

1. Plaintiff made protected disclosures regarding violations of law, misuse of public funds, discrimination, academic misconduct, and procedural violations.

2. Defendants knew of these disclosures.

3. Defendants retaliated by issuing baseless discipline, interfering with tenure review, and subjecting Plaintiff to hostile and adverse actions.

4. Plaintiff suffered damages as a result.

---

## COUNT 12 — Minnesota Human Rights Act Retaliation

Minn. Stat. § 363A.15

1. Plaintiff opposed discriminatory practices and participated in protected activity under the MHRA.

2. Defendants retaliated against Plaintiff for this protected activity.

3. Plaintiff suffered harm.

57

## COUNT 13 — Minnesota Human Rights Act Discrimination

Minn. Stat. § 363A.08

1. Plaintiff is a member of a protected class and was qualified for her position.

2. Defendants subjected Plaintiff to disparate treatment in pay, discipline, and employment conditions.

3. Plaintiff suffered damages.

## COUNT 14 — Defamation

1. Defendants published or enabled publication of false statements about Plaintiff, including through the anonymous letter and other communications.

2. These statements were made with knowledge of falsity or reckless disregard for the truth.

3. Plaintiff suffered reputational and professional harm.

## COUNT 15 — Tortious Interference with Employment Opportunities

1. Defendants intentionally interfered with Plaintiff's tenure review and professional opportunities by circulating false information and engaging in retaliatory conduct.

2. Defendants' actions were improper and without justification.

3. Plaintiff suffered harm.

## COUNT 16 — Breach of Contract (IFO Agreement)

1. Plaintiff's employment was governed by the IFO Agreement.

2. Defendants breached the Agreement by bypassing progressive discipline, violating the 60-day resolution requirement, imposing discipline without authority, and failing to follow required procedures.

3. Plaintiff suffered damages.

## COUNT 17 — Breach of the Covenant of Good Faith and Fair Dealing

1. Defendants acted in bad faith by manipulating contractual procedures to retaliate against Plaintiff.

2. Defendants' conduct deprived Plaintiff of the benefits of the contract.

3. Plaintiff suffered harm.

## COUNT 18 — Wage Theft / Underpayment

Minn. Stat. § 181.03

1. Defendants miscalculated Plaintiff's credited experience and salary step, resulting in underpayment.

2. Defendants failed to correct known discrepancies.

3. Plaintiff suffered economic harm.

### COUNT 19 — Negligent Supervision / Retention

1. Defendants failed to supervise or discipline employees who engaged in retaliation, misuse of confidential information, and procedural violations.

2. Defendants knew or should have known of the misconduct.

3. Plaintiff suffered harm.

### COUNT 20 — Intentional Infliction of Emotional Distress

1. Defendants engaged in extreme and outrageous conduct, including public yelling, harassment, fabricated allegations, and circulation of defamatory materials.

2. Defendants intended to cause emotional distress or acted with reckless disregard.

3. Plaintiff suffered severe emotional distress and medical conditions.

### COUNT 21 — Invasion of Privacy / Public Disclosure of Private Facts

1. Defendants disclosed confidential information about Plaintiff and students without authorization.

2. The disclosures were highly offensive and not of legitimate public concern.

3. Plaintiff suffered harm.

60

### COUNT 22 — Civil Conspiracy

1. Defendants acted in concert to retaliate against Plaintiff, fabricate allegations, and interfere with her employment.

2. Defendants committed overt acts in furtherance of the conspiracy.

3. Plaintiff suffered damages.

---

### COUNT 23 — Unequal Pay Under Title VII and the Equal Pay Act

1. 42 U.S.C. § 2000e-2(a); 29 U.S.C. § 206(d)

2. Plaintiff is a member of one or more protected classes and was qualified for her faculty position.

3. Defendants paid Plaintiff less than similarly situated faculty outside her protected classes, including male faculty, American-born faculty, and faculty of other racial or ethnic backgrounds with equal or lesser experience.

4. Plaintiff performed substantially equal work requiring equal skill, effort, and responsibility under similar working conditions.

5. Defendants lacked any legitimate, non-discriminatory justification for the pay disparities, and the disparities persisted even after Plaintiff reported them.

6. Defendants' actions constitute unlawful unequal pay under Title VII and the Equal Pay Act.

7. As a direct and proximate result, Plaintiff suffered economic losses and other compensable harm.

## COUNT 24 — Wage Theft / Underpayment

Minn. Stat. § 181.03

1. Defendants were required to accurately calculate Plaintiff's credited experience and salary step under the IFO Agreement and applicable University policies.

2. Defendants misreported Plaintiff's years of experience, misapplied the salary algorithm, and placed Plaintiff at an incorrect salary step, resulting in underpayment.

3. Plaintiff discovered discrepancies in her personnel file showing that Defendants failed to credit her full experience and concealed missing salary periods by removing start and end dates from paystubs.

4. Defendants failed to correct the underpayment after Plaintiff reported the discrepancies and after the Faculty Association confirmed that the salary algorithm predicted a higher step placement.

5. Defendants' conduct constitutes wage theft and unlawful underpayment under Minn. Stat. § 181.03.

6. Plaintiff suffered economic harm, including lost wages and benefits.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against all Defendants, and award the following relief:

### 1. Declaratory Relief

A declaration that Defendants' actions violated Plaintiff's rights under Title VII, the ADA, the Rehabilitation Act, 42 U.S.C. §§ 1981 and 1983, the False Claims Act, the Minnesota Whistleblower Act, the Minnesota Human Rights Act, Minn. Stat. § 181.03, and all other applicable laws.

### 2. Injunctive Relief

An order enjoining Defendants, in their official capacities, from continuing to engage in retaliation, discrimination, due-process violations, misuse of confidential information, or any other unlawful conduct.

### 3. Reinstatement or Front Pay

Reinstatement to Plaintiff's former position with all rights, rank, and benefits restored, or, in the alternative, an award of front pay in lieu of reinstatement.

### 4. Back Pay and Lost Benefits

An award of back pay, lost wages, lost salary step increases, lost benefits, and all other economic losses resulting from Defendants' unlawful conduct.

Amount of back pay not including inters is about $1.3 Million. Lost Benefits should be calculated

63

## 5. Compensatory Damages

Compensation for emotional distress, humiliation, reputational harm, mental anguish, and all other non-economic damages permitted by law.

## 6. Punitive Damages

Punitive damages against the individual Defendants sued in their personal capacities for their willful, malicious, reckless, or callous disregard of Plaintiff's federally protected rights.

## 7. Liquidated Damages

Liquidated damages as permitted under the Equal Pay Act, the Minnesota Wage Theft Statute, and any other applicable law.

## 8. Civil Penalties

Any statutory penalties available under Minn. Stat. § 181.03 and related wage statutes.

## 9. Pre-Judgment and Post-Judgment Interest

Interest on all monetary awards as permitted by law.

## 10. Attorney's Fees and Costs

An award of reasonable legal fees, attorney's fees, expert fees, and costs pursuant to 42 U.S.C. §§ 1988, 2000e-5(k), 12205, 31 U.S.C. § 3730(h), Minn. Stat. § 181.932, and all other applicable fee-shifting provisions.

**11. Expungement of Records**

An order requiring Defendants to remove and expunge the October 2023 reprimand, the retaliatory 1B.1 investigation, and all other unlawful or inaccurate materials from Plaintiff's personnel file.

**12. Any Other Relief**

Such other and further legal or equitable relief as the Court deems just and proper.

# Contents

**UNITED STATE DISTRICT COURT**.................................................................................. 1

**DISTRICT OF MINNESOTA** ............................................................................................ 1

PARTIES ............................................................................................................................ 1

FACTUAL ALLEGATION.................................................................................................. 1

1. Teaching Excellence and Positive Performance Evidence ............................................ 1

2. Institutional Instability and Administrative Mismanagement........................................ 3

3. Discriminatory Pay and Rank ...................................................................................... 3

    Minnesota State Government Payroll Data.................................................................... 5

    Table 1. Comparator (Asian)- Salary, Benefits, Promotion, and Rank Discrimination and Retaliation .................................................................................................................... 6

    Table 2. More Comparators Unequal Pay and Pay Discrimination. Data Obtained from Minnesota Government Payroll Data............................................................................. 8

    Rank and Salary Disparity ........................................................................................... 8

    More Comparators-Rank and Salary Discrimination .................................................... 9

    Ongoing Discriminatory Denial of Compensation-Bearing Opportunities and Administrative Roles .......................................................................................................................... 9

    Refusal to Cure Salary Disparity and Disappearing Paystub Dates ............................ 10

    Unequal and Discriminatory Pay ............................................................................... 11

    Unpaid Summer Over Time and Removal of Summer Assignment Following Protected Reporting.................................................................................................................... 12

4. Fraudulent Inducement Tenure, Promotion, Raise Discrimination ............................. 14

    Tenure and Promotion Timeline Comparators ........................................................... 15

5. Denial of Access to Personnel Records (2024-current)............................................... 16

6. Discrepancy Between Actual Job Posting and Personnel File Records ....................... 16

7. Intellectual Property Misappropriation and Misrepresentation .................................. 16

    Defendants Gort, and Arthur Knowledge of Plaintiff's Creation and Ownership of Her Intellectual Property.................................................................................................. 17

    Violation of IFO Contract on Intellectual Property Protection.................................... 17

    Violation of the University Policy on Intellectual Property ........................................ 18

8. Pattern of Adverse Actions Following Plaintiff's Reports .......................................... 19

    December 2021 Irregular Request to Alter Grades C Citing Financial Aid Reasons.............. 19

    January 2022-The Union Faculty Association (FA) President Interfered ................................ 20

    February 2nd 2022 Meeting with Plaintiff, FA President, and Defendants............................ 21

October 2023 Baseless Reprimand Issued Without Misconduct, Evidence, or Contractual Compliance .................................................................................................................... 22

November 2023 Documents Contradicted Defendant Gort February 2022 Communication... 23

November 2023 Discovery: Pattern of Misuse of Registration Appeals and Gort Seven Minutes Retaliation for Enforcing Academic Integrity ............................................... 25

November 2023 Discovery: Personnel File Review Reveals Experience and Salary Miscalculations ..................................................................................................... 27

December 5th and 6th 2023 University Documents Contradicted Gort's Prior Communications .................................................................................................................................. 28

Mid December 2023 ............................................................................................... 29

Mid December 2023 to Early January 2024: semester break. No duty days. ........................... 30

Early January 2024 ................................................................................................. 30

January 18th 2024 .................................................................................................. 30

January 28th – February 1st 2024 ............................................................................. 31

February 9th 2024 .................................................................................................. 31

February 18th Plaintiff's Medical Deterioration and Notice to Defendant Gort Following Retaliatory Conduct ................................................................................................ 32

March 1st 2024 Retaliation: Reopening a Closed Investigation, Absence of Due Process, Reverse Decision ................................................................................................... 32

Reporting on Equal Employment Opportunity-DSCI Hiring Search ...................................... 34

9. External Employment (IFO Contract, Comparators, Shifting Reasons, and Post Hoc Rationalization) ...................................................................................................... 37

IFO Contract ......................................................................................................... 37

Post Hoc Fabrication of Irrelevant "Login Count" ........................................................... 38

Concealing of Exculpatory Performance Evidence .......................................................... 39

Comparators Evidence and Defendants' False Statements ................................................ 41

December 6th 2023 Gort Concluded No Violation-No Discipline wrt External Employment 43

December 2023 Gort Concluded No Violation No Discipline Over External Employment .... 44

10. Shifting Main Termination Reason After Confrontation With Comparator Evidence ........... 45

Second False Reason: Plaintiff Protected Refusal ........................................................... 45

Retroactive Accommodation Violated University Policy and Was Misused to Create a False Narrative ............................................................................................................. 46

11. Denial of Reasonable Accommodation, Due Process, and Wrongful Termination .............. 48

CAUSES OF ACTION ............................................................................................. 52

COUNT 1 — Title VII Retaliation ............................................................................................ 52

COUNT 2 — Title VII Discrimination ..................................................................................... 53

COUNT 3 — ADA Retaliation ................................................................................................. 53

COUNT 4 — ADA Failure to Accommodate / Interference ..................................................... 54

COUNT 5 — Rehabilitation Act Retaliation ............................................................................ 54

COUNT 6 — 42 U.S.C. § 1981 Retaliation .............................................................................. 55

COUNT 7 — 42 U.S.C. § 1983 — Procedural Due Process Violations .................................... 55

COUNT 8 — 42 U.S.C. § 1983 — First Amendment Retaliation ............................................. 56

COUNT 9 — False Claims Act Retaliation ............................................................................... 56

COUNT 10 — FERPA-Based Retaliation / Unauthorized Disclosure (via §1983) ................. 57

COUNT 11 — Minnesota Whistleblower Act ........................................................................... 57

COUNT 12 — Minnesota Human Rights Act Retaliation ......................................................... 57

COUNT 13 — Minnesota Human Rights Act Discrimination ................................................... 58

COUNT 14 — Defamation ....................................................................................................... 58

COUNT 15 — Tortious Interference with Employment Opportunities ..................................... 58

COUNT 16 — Breach of Contract (IFO Agreement) ............................................................... 59

COUNT 17 — Breach of the Covenant of Good Faith and Fair Dealing ................................. 59

COUNT 18 — Wage Theft / Underpayment ............................................................................. 59

COUNT 19 — Negligent Supervision / Retention .................................................................... 60

COUNT 20 — Intentional Infliction of Emotional Distress ..................................................... 60

COUNT 21 — Invasion of Privacy / Public Disclosure of Private Facts ................................. 60

COUNT 22 — Civil Conspiracy ............................................................................................... 61

COUNT 25 — Unequal Pay Under Title VII and the Equal Pay Act ....................................... 61

COUNT 26 — Wage Theft / Underpayment ............................................................................. 62

REQUEST FOR RELIEF ........................................................................................................ 63

1. Declaratory Relief ............................................................................................................... 63

2. Injunctive Relief .................................................................................................................. 63

3. Reinstatement or Front Pay ................................................................................................. 63

4. Back Pay and Lost Benefits ................................................................................................ 63

5. Compensatory Damages ...................................................................................................... 64

6. Punitive Damages ................................................................................................................ 64

7. Liquidated Damages ............................................................................................................ 64

8. Civil Penalties ........................................................................................................... 64

9. Pre-Judgment and Post-Judgment Interest ................................................................ 64

10. Attorney's Fees and Costs ....................................................................................... 64

11. Expungement of Records .......................................................................................... 65

12. Any Other Relief ....................................................................................................... 65

69